# In the United States Court of Federal Claims

Nos. 11-460C and 11-461C
(Filed September 22, 2011)

* * * * * * * * * * * * * * * * * * * * * * *

**BLUESTAR ENERGY SERVICES, INC., d/b/a BLUESTAR ENERGY SOLUTIONS,**

Plaintiff,

v.

**THE UNITED STATES,**

Defendant.

* * * * * * * * * * * * * * * * * * * * * * *

Post-award bid protest; 28 U.S.C. § 1491(b)(1) (2006); Veterans Benefits, Health Care, and Information Technology Act of 2006, Pub. L. No. 109-461, §§ 502-03 (codified at 38 U.S.C. §§ 8127-28 (2006)); service disabled veteran-owned small business set-aside; jurisdiction; standing; futility; mootness.

Alan W. Nicgorski, Chicago, IL, for plaintiff. Bryan R. King, Barton Baker Thomas & Tolle, LLP, McLean, VA, of counsel.

William J. Grimaldi, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant. Richard R. Butterworth, Jr., Sr. Assistant General Counsel, U.S. General Services Administration, Real Property Division, Washington, DC, and Paul R. Hahn, Sr. Counsel, DLA Counsel Energy, Fort Belvoir, VA, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

These consolidated post-bid award protests are before the court after argument on defendant's motion to dismiss for lack of subject matter jurisdiction. Although the parties briefed the issue whether plaintiff's failure to submit complete proposals deprived plaintiff of standing, mootness came into play when plaintiff's eligibility to propose as a service-disabled veteran-owned small business was withdrawn by the United States Department of Veterans Affairs (the "VA").

## FACTS

I. Background

1. The General Services Administration's Solicitation (No. 460C)

BlueStar Energy Services, Inc. ("plaintiff"), alleges that it is a service-disabled veteran-owned small business ("SDVOSB") in the electricity-supply industry. Plaintiff protests the General Services Administration's ("GSA") Request for Proposal (the "RFP") designated Solicitation No. GS-00P-11-BSD-0822 that sought proposals for electric power supply to federal and non-federal accounts in Maryland ("PEPCO MD") and the District of Columbia ("PEPCO DC"). PEPCO MD is a bundle of thirty-four federal accounts, and PEPCO DC is a bundle of 153 federal accounts. The Washington, DC VA Medical Center account is contained in the PEPCO DC bundle.

On March 23, 2011, GSA released its presolicitation for the RFP. The deadline to submit pricing proposals for PEPCO DC and PEPCO MD was May 3, 2011. Before the May 3 deadline, plaintiff submitted an agency-level bid protest to the Government Accountability Office (the "GAO"), alleging that (1) the RFP constitutes an improper bundling of smaller contracts, imposing unnecessary contractual requirements to the exclusion of SDVOSBs; (2) GSA did not make any attempt to encourage SDVOSB participation in the RFP; and (3) as to the PEPCO DC bundle, GSA impermissibly bundled a United States Department of Veterans Affairs ("VA") procurement with other procurements that are not subject to 38 U.S.C. §§ 8127-28 (2006), which requires that the Government give priority to SDVOSBs.

The GAO dismissed the protest as untimely, finding that, although the protest was filed before the due date for submitting pricing proposals, it was filed after the technical proposal due date. BlueStar Energy Servs. Inc., B-405069 (Comp. Gen. May 12, 2011). The GAO explained that, "[w]here a solicitation provides multiple due dates for different proposal elements, a protest alleging solicitation defects known then is untimely if filed after the earliest closing time." Id.

On May 16, 2011, plaintiff filed a request for reconsideration of the GAO decision. The GSA contract was awarded on the following day to Direct Energy Business, LLC ("Direct Energy"), and Constellation NewEnergy, Inc. ("Constellation"). On May 20, 2011, plaintiff filed a complaint in the United States Court of Federal Claims, but dismissed that complaint without prejudice on May 31, 2011. Plaintiff then renewed its request for reconsideration, which was subsequently dismissed by the GAO on July 6, 2011.

2. The Defense Logistics Agency's RFP (No. 461C)

Plaintiff protests the Defense Logistics Agency's ("DLA") RFP designated Solicitation No. SP0600-11-R-0401 that sought proposals for electric power supply to Department of Defense and federal civilian installations in Maryland, New Jersey, and the District of Columbia. Shortly after DLA requested bids, plaintiff objected to the RFP, arguing that it failed to include SDVOSB and small business concern ("SBC") set-asides. In response to plaintiff's objections, DLA issued "Amendment 1," which established SDVOSB and SBC set-asides. Amendment 1 required, *inter alia*, that SDVOSBs and SBCs satisfy the Nonmanufacturer Rule ("NMR"), which mandates that a nonmanufacturer of the requested item must commit to supply the product of a small-business manufacturer. See 13 C.F.R. § 121.406(b) (2011). Plaintiff challenged the manufacturing requirement in light of 13 C.F.R. § 121.406(b)(3), which restricts application of the NMR "only to procurements that have been assigned a manufacturing code . . . ." DLA had assigned the RFP NAICS code 221112—a service-industry classification. Therefore, the DLA contract was a service—not a supply—contract, and the NMR could not be included as a technical requirement. On February 11, 2011, although DLA rejected plaintiff's objection, it dissolved all set-asides after determining that none of the offerors qualified as a SDVOSB or SBC.

Plaintiff also sought from the Small Business Administration (the "SBA") a class waiver from the NMR requirement. The SBA denied the request after finding that SBCs currently participate in the federal marketplace in the electricity-supply industry, citing 13 C.F.R. § 121.1202(a) (2011), which provides that "[a] waiver for a class of products (class waiver) will be granted when there are no small business manufacturers or processors available to participate in the Federal market for that class of products." The SBA further noted that SBCs in the utility sector are classified as participating in a service industry and that the NMR does not apply to service contracts. 1/

Thereafter, plaintiff filed a formal protest with the GAO, objecting to DLA's creation of set-asides subject to the NMR and subsequent dissolution of those set-asides. In its protest plaintiff argued that (1) the RFP constitutes an improper bundling of smaller contracts, imposing unnecessary contractual requirements to the exclusion of SDVOSBs; (2) DLA did not make any attempt to encourage SDVOSB participation in the RFP; and (3) it is improper to require that all SDVOSBs and SBCs seeking set-asides satisfy the NMR. As to its third challenge, plaintiff explained that, because DLA assigned NAICS code 221112—a service industry classification—to the RFP, it cannot require plaintiff and other similar offerors to satisfy the NMR, which "does not apply to contracts that have been assigned a service, construction, or specialty trade construction NAICS code." 13 C.F.R. § 121.406(b)(3).

---

1/ The SBA did not state that the DLA contract was a service contract. To the contrary, the SBA generally stated that the NMR does not apply to service contracts.

In response DLA argued that plaintiff's protest was untimely, not only because plaintiff failed to appeal the DLA's February 11, 2011 decision within ten days of receiving it, but also because plaintiff's protest was filed after the deadline for submission of technical proposals had passed. Plaintiff replied, urging the GAO to draw on its plenary authority to permit the protest if it found merit in DLA's assertion that the protest was, in fact, untimely. On May 12, 2011, the GAO dismissed plaintiff's protest, finding it to be untimely. Plaintiff sought reconsideration of the GAO's decision on May 16, 2011.

On May 19, 2011, DLA awarded the contract to Constellation and Hess Corporation ("Hess"). On May 20, 2011, plaintiff filed a complaint in the Court of Federal Claims, but dismissed that complaint without prejudice on May 31, 2011. Plaintiff then renewed its request for reconsideration, which was subsequently dismissed by the GAO on July 6, 2011.

3. Proceedings in the Court of Federal Claims

On July 15, 2011, plaintiff again filed complaints in the Court of Federal Claims, protesting the GSA and DLA Solicitations. The court consolidated the protests on July 20, 2011. Both complaints carried forward the allegations made in plaintiff's GAO protests. Plaintiff contends that GSA improperly (1) bundled contracts, (2) excluded SDVOSBs, and (3) included a VA procurement in a contract bundle that did not comply with the procedures required for VA procurements. According to plaintiff, GSA did not comply with the procedures required to engage in bundling, which "refers to the consolidation of two or more procurement requirements for goods or services previously provided or performed under separate smaller contracts into a solicitation of offers for a single contract that is likely to be unsuitable to award to a small business concern," 13 C.F.R. § 125.2(d)(1)(I) (2011). To engage in bundling, GSA is required to provide a "statement explaining why bundling is necessary and justified." 48 C.F.R. (FAR) § 19.202-1(e)(2)(v) (2011). Nor did GSA engage in market research to "determine whether consolidation of the requirements is necessary and justified." 15 U.S.C. § 644(e)(2)(A) (2006) ("Before proceeding with an acquisition strategy that could lead to a contract containing consolidated procurement requirements, the head of an agency shall conduct market research to determine whether consolidation of the requirements is necessary and justified."). Further, GSA failed to quantify identified benefits and explain the measurable impact of the benefits on the procurement. See 13 C.F.R. § 125.2(d)(5). No substantial benefit is derived from the bundled procurement, as required by 15 U.S.C. § 644(e)(2)(B). Finally, plaintiff contends that GSA failed to provide the proper thirty-day notice of its intent to bundle the contracts. See 13 C.F.R. § 125.2(b)(3) (requiring Government to provide copy of proposed acquisition strategy when engaging in bundling at least thirty days before the solicitation is issued); FAR 19.202-1(e)(1)(iii) ("The contracting officer shall provide all information relative to the justification of contract bundling . . . .").

As to its second allegation in its GSA protest, plaintiff notes that SDVOSB set-asides are intended to further a general policy mandated by Congress and the President of attaining SDVOSB participation of "not less than 3 percent . . . in Federal contracting." Exec. Order No. 13,360, 69 Fed. Reg. 62,549 (Oct. 20, 2004). This general policy also aims to "avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors." 15 U.S.C. § 631(j)(3) (2006).

With regard to the PEPCO DC bundle, plaintiff alleges that GSA impermissibly bundled a VA procurement with other procurements for which the Government is not required to give priority to SDVOSBs. See 38 U.S.C. § 8127 (requiring Government to give priority to SDVOSBs). According to plaintiff, this bundling contravenes 38 U.S.C.§ 8127, which requires that priority be given to SDVOSBs competing for VA procurements.

Plaintiff's first and second allegations against DLA are the same as those against GSA. In addition, plaintiff alleges that it was improper for DLA to require that all SDVOSBs and SBCs seeking set-asides satisfy the NMR. DLA assigned its RFP a service-industry classification. The NMR, however, "applies only to procurements that have been assigned a manufacturing code . . . ." 13 C.F.R. § 121.406(b)(3). Consequently, it was improper for DLA to include satisfaction of the NMR as a technical requirement.

Plaintiff has asked for a declaration that GSA and DLA unlawfully bundled contracts without the requisite notice and market research and failed to include any mechanism to encourage participation by SBCs and SDVOSBs. Additionally, plaintiff seeks an injunction either dissolving the RFPs or requiring the agencies to re-bid the RFPs after performing market research and providing the requisite notice. As to only GSA, plaintiff requests a declaration that the agency impermissibly bundled VA procurements with procurements for which GSA was not required to give priority to SDVOSBs. Finally, plaintiff requests a finding that DLA improperly included the NMR as a technical qualification and an injunction requiring DLA to re-bid those components previously subject to the NMR restriction.

On August 2, 2011, defendant moved to dismiss both complaints for lack of jurisdiction because plaintiff does not qualify as an "interested party" with respect to either Solicitation. On August 26, 2011, defendant filed a Notice of Department of Veterans Affairs Ineligibility Determination that had been issued on July 15, 2011, reflecting the VA's conclusion that plaintiff does not qualify as a SDVOSB. On August 30, 2011, this court heard oral argument on defendant's motion to dismiss.

## DISCUSSION

I. Subject matter jurisdiction

The Court of Federal Claims derives jurisdiction over bid protests from the Tucker Act, 28 U.S.C. § 1491(b)(1) (2006). Specifically, the court has jurisdiction over actions by an "interested party" objecting to (1) a solicitation by a federal agency for bids or proposals for a proposed contract; (2) a proposed award or the award of a contract; or (3) any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement. 28 U.S.C. § 1491(b)(1); see also Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The court may "award any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

II. Standing

"[S]tanding is a threshold jurisdictional issue." Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Every plaintiff must have standing to invoke the court's jurisdiction over a bid protest. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]."). "'The Court of Federal Claims, though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III.'" Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)). In this bid protest, the question of standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." Id. Section 1491(b)(1) provides, in pertinent part, as follows:

> [T]he United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). The pivotal element of standing in a bid protest is whether a protester qualifies as an "interested party" under § 1491(b)(1). See Weeks, 575 F.3d at 1359; see also Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("AFGE") (holding that "interested party" under Tucker Act is construed in accordance with Competition in Contracting Act, 31 U.S.C. § 3551(2) (2000)).

The United States Court of Appeals for the Federal Circuit defines "interested party" in § 1491(b)(1) as "limited to actual or prospective bidders or offerors whose direct economic

interest would be affected by the award of the contract or by failure to award the contract [by the Government]." AFGE, 258 F.3d at 1302. This statutory definition imposes a two-part burden to establish standing: plaintiff must show (1) that it is an actual or prospective bidder and (2) that it possesses a direct economic interest. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To satisfy the second prong, the protester must show that it was "prejudiced by a significant error in the procurement process." Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009); see also Weeks, 575 F.3d at 1360-61 (equating showing of economic interest with showing of prejudice); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (explaining that "the question of prejudice goes directly to the question of standing"); Myers, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). "A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract." Labatt, 577 F.3d at 1378; see also Rex Serv., 448 F.3d at 1308 ("To prove a direct economic interest as a putative prospective bidder, [the offeror] is required to establish that it had a 'substantial chance' of receiving the contract." (citing Myers, 275 F.3d at 1370; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996))).

1. Actual or prospective bidder

A plaintiff seeking to establish standing as an actual bidder must have bid or made an offer. Rex Serv., 448 F.3d at 1307-08. Alternatively, a plaintiff must "be expecting to submit an offer prior to the closing date of the solicitation." Id. at 1308 (quoting MCI Telecomms. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989) (citations omitted)). The opportunity to establish standing as an actual or prospective bidder ceases when the proposal period ends. MCI Telecomms. Corp., 878 F.2d at 365.

Defendant explains that both the GSA and DLA Solicitations required the submission of proposals in two phases: offerors would first submit technical proposals and later, price proposals. It is undisputed that plaintiff submitted technical proposals in response to both Solicitations but did not submit price proposals. Defendant reasons that, under Rex Service, plaintiff cannot be considered an actual bidder because, having failed to submit the mandatory price proposals, it has not made an offer in response to the Solicitations. Def.'s Br. filed Aug. 2, 2011, at 11; see also Rex Serv., 448 F.3d at 1307 ("Rex did not bid, and, therefore, it is not an 'actual bidder.'").

Plaintiff's submission of technical proposals under both Solicitations is insufficient to confer interested-party status because the Solicitations required that offerors comply with the two-phase submission process. Moreover, plaintiff is not a prospective bidder because the proposal period has ended; consequently, plaintiff cannot realistically expect or intend to complete its bid by submitting the required price proposals. See Rex Serv., 448 F.3d at 1307-08; MCI Telecomms. Corp., 878 F.2d at 365.

In RhinoCorps Ltd. v. United States, 87 Fed. Cl. 673 (2009) ("RhinoCorps II"), the 709th Armament System Squadron (the "ARSS"), an agency of the United States Air Force (the "Air Force"), had awarded a services contract (the "ARSS contract") to the plaintiff, a small business, pursuant to a small business set-aside. RhinoCorps II, 87 Fed. Cl. at 675. Shortly before the ARSS contract was set to expire, the ARSS contracting officer informed the plaintiff that the contract would not be recompeted; instead, it would be fulfilled through an ongoing contract out of a different contracting office. Id. When the plaintiff broached the possibility of a follow-on contract to the ARSS contract, the Air Force indicated that, because ARSS requirements had changed, it was no longer required to maintain the work that was the subject of the plaintiff's contract as a small-business set-aside. Id. Following expiration of its contract, the plaintiff filed suit seeking declaratory and injunctive relief, with jurisdiction predicated on 28 U.S.C. § 1491(b), "reversing" the Air Force's decision not to solicit a follow-on contract and not to extend the plaintiff's contract. Id. at 676. The Air Force submitted its Determination and Findings (the "D&F"), setting forth its conclusion that, because the Air Force found "that no reasonable expectation existed that the Air Force would receive offers from at least two responsible small businesses," it complied with federal acquisition regulations pertaining to small-business set-asides, thereby mooting plaintiff's claim that the Air Force violated small-business procurement regulations. Id. After defendant moved to dismiss the plaintiff's suit for lack of subject matter jurisdiction, the court granted the motion "with respect to plaintiff's claim for diversion of work from the ARSS contract . . . [but the] motion to dismiss plaintiff's claim on the merits was denied because plaintiff had pleaded sufficient facts to establish that the Air Force's D&F . . . was unreasonable." Id. (referencing decision rendered on defendant's motion to dismiss in RhinoCorps Ltd. v. United States, 85 Fed. Cl. 712, 723-24 (2009) ("RhinoCorps I")).

When the solicitation in RhinoCorps II, which invited full and open competition and did not contain a small-business set-aside, ultimately was issued on February 23, 2009, id. at 677, the plaintiff did not submit a bid. In contesting the plaintiff's request for an injunction, the Air Force contended that, because the plaintiff did not respond to the solicitation, it was not an interested party and was unable to satisfy a threshold requirement for invoking jurisdiction under § 1491. Id. at 678. Despite the plaintiff's failure to respond to the solicitation, the court ruled that the plaintiff was an interested party and that jurisdiction lay to grant preliminary injunctive relief. 2/ Id. Lest this appear to be an unjustified departure from the United States Court of Appeals for the Federal Circuit's holding in Rex Service, the court identified two distinguishing factors. First, at the time the solicitation was issued, the plaintiff's protest already was pending. Id. Moreover, the

---

2/ In so holding, the court recognized its previous determination that plaintiff had standing to pursue its suit, RhinoCorps I, 85 Fed. Cl. at 721, and concluded that "plaintiff has established that jurisdiction will not be a bar to consideration of plaintiff's arguments on the merits." RhinoCorps II, 87 Fed. Cl. at 678.

plaintiff's failure to bid resulted from the Air Force's earlier determination that small businesses—like the plaintiff—were unable to satisfy the contract's requirements. Id. Faced with this reality, the plaintiff resolved that it "could not afford the significant expense and effort of proposal preparation, given the apparent futility of such effort." Id. (citations omitted).

The Federal Circuit held in Rex Service that the plaintiff could not invoke the Court of Federal Claims's bid protest jurisdiction because it was neither an actual nor a prospective bidder and lacked a direct economic interest in the contract award. Rex Serv., 448 F.3d at 1307-08. As with plaintiff in the case at bar and the plaintiff in RhinoCorps II, the Rex Service plaintiff was not an actual bidder because it did not submit a bid. Id. at 1307. Furthermore, it was not a prospective bidder because the proposal period had ended by the time the protest was filed with the court. Id. at 1308. It mattered not to the Federal Circuit that the plaintiff had filed a pre-award agency protest and alleged that the agency's illegal acts had prejudiced its ability to bid, for the plaintiff "could have [bid] for the contract award . . . and could have utilized the protest procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process." Id. (citation omitted). Thus, unlike the RhinoCorps II plaintiff that was prejudged as being unable to satisfy the contract's requirements, the plaintiff in Rex Service was within the category of offerors that would have been considered as potential awardees of the contract.

Analogizing itself to the plaintiff in RhinoCorps II, plaintiff argues that it would have been futile to submit price proposals because GSA and DLA had not made any attempts to encourage participation by SDVOSBs like plaintiff, resulting in a diminished likelihood that plaintiff would be awarded the contract. Pl.'s Br. filed Aug. 16, 2011, at 7. The requested relief is "the rebidding of certain components of the two solicitations . . . in compliance with the law regarding participation by qualified SBC and/or SDVOSB bidders." Id. at 6. Accordingly, because plaintiff has noted its intention to submit bids in response to any re-issued solicitations, plaintiff contends that it is a prospective bidder. Id. at 6, 8.

Although plaintiff relies on RhinoCorps II to bolster its claim that, despite its failure to submit price proposals in light of the apparent futility of doing so, it is still a prospective bidder, plaintiff has not addressed the second factor relied on by this court in determining that the plaintiff in RhinoCorps II had standing to invoke the court's bid protest jurisdiction: when the protest was filed. Defendant, on the other hand, points to plaintiff's filing of the protests after the award of the contracts to demonstrate why RhinoCorps II is inapposite. Although defendant's observation that plaintiff and the RhinoCorps II plaintiff filed their protests at different points in the procurement process is correct, this procedural difference alone does not bar plaintiff from establishing that it is a prospective bidder.

In distinguishing the facts presented in RhinoCorps II from those in Rex Service, this court acknowledged that the pending protest in RhinoCorps II was intended to prevent issuance of a solicitation providing for full and open competition. RhinoCorps II, 87 Fed. Cl. at 678. After the plaintiff filed suit, the Air Force issued such a solicitation to which the plaintiff did not respond. Id. The timing of filing is significant not on its own, but rather because of what the filing reveals about the nature or source of the alleged futility. In RhinoCorps II, the plaintiff's protest sought to prevent the solicitation that subsequently issued and on which the plaintiff had been made aware it would be futile to bid. The futility was apparent before the solicitation issued and had its source in the Air Force's prejudgment of the plaintiff's ability to perform the contract. To the contrary, the post-award protest in Rex Service challenged the award of the contract, contending that in making the award, the agency departed from the process specified in its RFP. Rex Serv., 448 F.3d at 1307. Unlike the RhinoCorps II protest, that in Rex Service had no effect on the futility or success of the offeror's offer. Had the Rex Service plaintiff, anticipating that the agency would depart from its stated proposal-review processes, filed its complaint before the solicitation was issued, it still would not have been futile for the plaintiff to submit a bid because, even straying from its stated processes, the agency may have awarded the contract to the plaintiff.

Furthermore, in identifying the timing of filing as a factor influencing its decision that the plaintiff had standing, the court in RhinoCorps II was emphasizing that it already had addressed standing when the action was initially filed and, in doing so, had answered the question in the affirmative, finding that plaintiff's suit was properly before the court. Because the Air Force had prejudged small businesses, like the plaintiff, to be "incapable of satisfying its requirements," the plaintiff did not submit an offer, believing itself precluded from consideration on account of its status as a small business. RhinoCorps II, 87 Fed. Cl. at 678. In the instant case, plaintiff attests that it was cost prohibitive to submit pricing proposals, given that the Solicitations did not contain any SBC or SDVOSB set-asides and plaintiff would be competing against larger energy suppliers that could avail themselves of preferential pricing terms. See Declaration of Jon Casadont, Aug. 16, 2011, ¶¶ 4-5. At oral argument plaintiff's counsel represented that, historically, DLA had found that SBC and SDVOSB contractors were incapable of meeting contract requirements. Mr. Casadont, plaintiff's Chief Legal Officer, declared that in meetings with DLA it was suggested that small businesses, like plaintiff, were not able to perform the work that was the subject of the RFP. See Casadont Decl. ¶ 5. In fact, Mr. Casadont's Declaration merely states that, "when bidding on unrestricted DLA procurements in the past, BlueStar was told that its proposals were not in the right price range, including during a meeting at DLA in January 2011." Id. Thus, the most that Mr. Casadont offers is that plaintiff previously had been advised by DLA that its pricing was higher than that of other offerors.

The showing of futility in RhinoCorps II is distinguishable from that cited by plaintiff. Futility in this context requires something more than a subjective determination by one party.

In RhinoCorps II that "something more" was the fact that the Air Force had prejudged the plaintiff's ability to satisfy the contract's requirements and concluded that the plaintiff and similar small businesses were unable to do so. In the cases at bar, plaintiff has advanced only its own subjective determination that submitting price proposals would have been futile due to the significant costs that it would have incurred. Mr. Casadont's Declaration does not provide any justification for plaintiff's conclusion that it was futile to submit a bid, nor does it indicate that either GSA or DLA prejudged plaintiff as incapable of performing the contract. The two factors relied on by this court in distinguishing RhinoCorps II from Rex Service are not present here. Plaintiff, therefore, is neither an actual nor a prospective bidder and cannot be deemed an interested party for purposes of invoking this court's bid protest jurisdiction.

2. Direct economic interest

Had plaintiff satisfied the court that it was an actual or prospective bidder, it still would have been required to demonstrate that it had a direct economic interest in the award of the contract. See AFGE, 258 F.3d at 1302. To do so a protester must show that it was "prejudiced by a significant error in the procurement process." Labatt, 577 F.3d at 1378. Prejudice occurs when "but for the [agency's] error, [the protester] would have had a substantial chance of securing the contract." Id. Defendant argues that, because plaintiff did not submit price proposals, it failed to submit complete offers on either Solicitation and therefore lacks an economic interest in the contract awards. Def.'s Br. filed Aug. 2, 2011, at 11. Even if plaintiff demonstrated an error on the part of GSA or DLA, it cannot establish that it was prejudiced by that error because its "own inactions prevented it from having a substantial chance of receiving [the] award." Id. at 12. Thus, plaintiff cannot satisfy its burden of establishing interested-party status.

Plaintiff explains that it has a direct economic interest in both contracts because it intends to submit bids in response to any revised solicitations. Pl.'s Br. filed Aug. 16, 2011, at 6, 8. Plaintiff relies on Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001). The plaintiff in that case protested the contracting officer's responsibility determination concerning the successful offeror as arbitrary and capricious. Id. at 1329, 1334. The Federal Circuit explained that the protester in MCI Telecommunications lacked a direct economic interest because, even if its protest were successful, the award would have gone to another party, given that the protester never submitted a proposal and thus was not within the competitive range. Id. To the contrary, Domenico Garufi submitted a proposal and was not included in the competitive range only because the agency eliminated it on account of the terms of its technical proposal. Id. at 1329. The Federal Circuit thus concluded that Domenico Garufi had a substantial chance of receiving the award and a direct economic interest in the outcome: "if [its] bid protest were allowed . . . the government would be obligated to rebid the contract, and [Domenico Garufi]

could compete for the contract once again." Id. at 1334. Plaintiff contends that Domenico Garufi governs because it submitted technical proposals and, as one of the only SDVOSBs in the electricity-supply industry, has a substantial chance of securing the contract if it is rebid. Pl.'s Br. filed Aug. 16, 2011, at 8. Accordingly, plaintiff concludes that it has the requisite direct economic interest.

Contrary to plaintiff's contention, Domenico Garufi is not controlling. Although the plaintiff in that case was eliminated on the basis of its technical proposal, it had submitted a complete proposal. Domenico Garufi, 238 F.3d at 1329. In the case at bar, plaintiff never submitted a complete proposal. This case is more analogous to Labatt, which defendant cites in support of its position. In Labatt the agency permitted the initial offerors—the protester and two other vendors—to submit revised proposals after the protester filed GAO protests challenging the agency action. Labatt, 577 F.3d at 1377-78. Thereafter, the agency informed the protester that its revision would not be considered because it had been filed late. Id. at 1378. In reversing the court's decision vacating award of the contract, the Federal Circuit concluded that the protester was without standing to challenge the award because it lacked a direct economic interest in the contract award. Id. at 1381. Because the protester failed to submit a timely proposal revision, it could not demonstrate that it had a substantial chance of securing the contract. Id. Its own failure, not any error on the agency's part, prevented it from obtaining the contract. Id. Similarly, plaintiff in the case *sub judice* failed to submit price proposals and thus was not considered for the award. Consequently, plaintiff's failure to submit complete proposals prevents it from establishing that, but for the alleged improprieties in the Solicitations, it would have had a substantial chance of securing the contract.

## III. Mootness

As with standing, the mootness doctrine originates from the "case or controversy" requirement of Article III of the United States Constitution. Gerdau Ameristeel Corp. v. United States, 519 F.3d 1336, 1340 (Fed. Cir. 2008) (citing Allen v. Wright, 468 U.S. 737, 750 (1984); North Carolina v. Rice, 404 U.S. 244, 246 (1971)). Federal courts are permitted only to entertain matters in which there is an ongoing justiciable issue. See NEC Corp. v. United States, 151 F.3d 1361, 1369 (Fed. Cir. 1998). As such, mootness implicates the court's subject matter jurisdiction. Id. ("If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction."). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). "Thus, to avoid dismissal for mootness, an actual controversy must remain at all stages, not merely at the time the complaint is filed." Gerdau Ameristeel, 519 F.3d at 1340.

A case will be dismissed as moot if an intervening event during its pendency "renders it impossible for [the] court to grant any effectual relief." Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1372 (Fed. Cir. 2000) (holding tax refund suit not moot despite plaintiff's subsequent compliance with tax refund statute because plaintiff potentially could recover additional taxes under Tucker Act); see also 15 Moore's Federal Practice § 101.93[2] (Matthew Bender 3d ed.) ("A claim may . . . be rendered moot because the plaintiff, as a result of some intervening factual event, has lost a present right to be vindicated or no longer has a stake or interest in the outcome of the litigation."). As explained by the United States Supreme Court, "jurisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, and, (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citations omitted). "When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law." Id.

1. SDVOSB certification

The Veterans Benefits, Health Care, and Information Technology Act of 2006, Pub. L. No. 109-461, §§ 502-03 (codified at 38 U.S.C. §§ 8127-28 (2006)), was enacted to increase contracting opportunities for SDVOSBs and veteran-owned qualified small businesses. See 38 U.S.C. § 8127(a). Accordingly, the VA sets aside certain contracts for SDVOSB concerns. See id. §§ 8127-28. The VA keeps an online database of qualified SDVOSBs at its Vendor Information Pages ("VIP") website, www.VetBiz.gov. See id. § 8127(f) ("[T]he Secretary shall maintain a database of small business concerns owned and controlled by veterans and the veteran owners of such business concerns."); FAR 804.1102 (providing VIP online database).

Until January 1, 2012, in order to be awarded a contract, an otherwise qualified SDVOSB must be listed in the VIP database. See id. § 8127(e) ("A small business concern may be awarded a contract under this section only if the small business concern and the veteran owner of the small business concern are listed in the database of veteran-owned businesses maintained by the Secretary under subsection (f)."); FAR 804.1102 ("Prior to January 1, 2012, all . . . SDVOSBs must be listed in the VIP database, available at http://www.vetbiz.gov, and also must be registered in the Central Contractor Registration (CCR) (see 48 CAR subpart 4.11) to receive contract awards under VA's Veteran-owned Small Business prime contracting and subcontracting opportunities program."). Also until December 31, 2011, an applicant can self-represent its status as a SDVOSB in the VIP database. See FAR 819.7003(b) ("At the time of submission of offer, the offeror must

represent to the contracting officer that it is a—(1) SDVOSB concern . . . and (3) Verified for eligibility in the VIP database."). 3/

After December 31, 2011, the regulations require that an applicant be "listed as verified" in the VIP database. FAR 804.1102 ("After December 31, 2011, all . . . SDVOSBs, must be listed as verified in the VIP database, and also must be registered in the CCR to be eligible to participate in order to receive new contract awards under this program."). The VA Center for Veterans Enterprise (the "CVE") evaluates applications for inclusion in the VIP database to verify whether an applicant satisfies the eligibility requirements to be listed as a SDVOSB. See 38 C.F.R. § 74.11(a) (2011) ("The Director, Center for Veterans Enterprise, is authorized to approve or deny applications for VetBiz VIP Verification. The CVE will receive, review and evaluate all VetBiz VIP Verification applications."). "Once an application, a request for reconsideration, or an appeal to a cancellation notice, as applicable, has been denied, the applicant or participant shall be required to wait for a period of 6 months before a new application will be processed by CVE." 38 C.F.R. § 74.14.

38 C.F.R. Part 74 and FAR Part 819, when read together, establish a comprehensive regulatory scheme to ensure verification of SDVOSB status in order to prevent unscrupulous offerors from misrepresenting their veteran or service-disabled ownership status. In so doing, the VA is fulfilling its verification obligation according to congressional mandate, as prescribed by 38 U.S.C. § 8127(f)(4) ("In maintaining the database, the Secretary shall carry out at least the following two verification functions: (A) Verification that each small business concern listed in the database is owned and controlled by veterans. (B) In the case of a veteran who indicates a service-connected disability, verification of the service-disabled status of such veteran."). FAR 819.7003 sets forth the eligibility requirements for SDVOSBs and provides that such eligibility is governed by certain SBA regulations, "except where expressly directed otherwise by . . . 38 C.F.R. verification regulations for SDVOSBs . . . ." Id. § 819.7003(a). Moreover, this regulation also requires an offeror bidding on a solicitation to represent to the contracting officer that the offeror is "[v]erified for eligibility in the VIP database." Id. § 819.7003(b)(3). 38 C.F.R. § 74.2, in turn, lists "the eligibility requirements for VIP verification." VA Acquisition Regulation: Supporting Veteran-Owned and Service-Disabled Veteran-Owned Small Businesses, 74 Fed. Reg. at 64,619. 38 U.S.C. § 8127(e) conditions award of a SDVOSB contract upon inclusion in the VIP database. If plaintiff is ineligible to be listed therein, it cannot show a substantial chance of securing the contract and, therefore, cannot establish prejudice. Without such a showing, plaintiff is not

---

3/ The regulations define a SDVOSB as having "the same meaning as defined in the Federal Acquisition Regulation (FAR) part 2.101, except for acquisitions authorized by 813.106 and subpart 819.70. These businesses must then be listed as verified on the Vendor Information Pages (VIP) database at http://www.vetbiz.gov." FAR 802.101 (2010).

an interested party for Tucker Act purposes and lacks standing to bring its claim in the Court of Federal Claims.

In protesting both the GSA and DLA Solicitations as improper, plaintiff alleged that the agencies failed to make any attempts to encourage participation by SDVOSBs in contravention of Executive Order 13,360, Exec. Order No. 13,360, 69 Fed. Reg. 62,549 (Oct. 20, 2004), and 15 U.S.C. § 644(g)(1), which set minimum goals for participation by small businesses in procurement contracts. Additionally, in its protest of the DLA Solicitation, plaintiff alleged that the Solicitation was improper in that it required all SDVOSBs and SBCs to satisfy the NMR. According to plaintiff, these improprieties rendered the Solicitations unlawful, necessitating a rebidding.

On August 26, 2011, defendant filed a notice to the effect that plaintiff is neither certified as nor qualified to be a SDVOSB. Def.'s Br. filed Aug. 26, 2011, at 1. The actual letter from the CVE denied plaintiff's application for inclusion in the VIP database. The CVE letter explained that plaintiff is a wholly-owned subsidiary of BSE Holdco, LLC, a holding company that itself is a wholly-owned subsidiary of BlueStar Energy Holdings, Inc., a corporation owned 75% by a service-disabled veteran. Given this chain of ownership, the entity owned by the service-disabled veteran is BlueStar Energy Holdings, Inc., not plaintiff. Plaintiff, therefore, is unable to satisfy the "direct ownership" requirement for certification as a SDVOSB.

The CVE letter also announced that plaintiff is unable to satisfy the "control" requirement even though the service-disabled veteran sits on plaintiff's Board of Directors. Plaintiff's bylaws provide that it is managed and governed by a Board of Directors (the "Board") that can act when a quorum—a majority of directors—is present. Given that plaintiff's Board consists of five directors, three must be present to constitute a quorum. Consequently, because the Board can act in the absence of the service-disabled veteran, it cannot be said that the service-disabled veteran has control of the Board and/or plaintiff. Failure to meet the control requirement for a SDVOSB therefore prevented plaintiff from qualifying as a SDVOSB.

Defendant takes the position that plaintiff's ineligibility for SDVOSB set-asides is decisive that plaintiff lacks standing to pursue these protests. To establish its standing, plaintiff was required to prove both that it is an actual or prospective bidder and that it had a direct economic interest in the award of the contract. For the reasons stated above, see supra Part II.1-II.2, plaintiff has failed to show that it is an actual or prospective bidder and that it has a direct economic interest in the award of the contract. Defendant reasons that plaintiff was not prejudiced by any government action or inaction as to SDVOSB set-asides because, having failed to qualify as a SDVOSB, plaintiff was not eligible to benefit from these set-asides. Moreover, defendant contends that plaintiff's ineligibility for the set-asides

precludes the court from affording plaintiff the requested relief, thereby rendering plaintiff's claims moot. Def.'s Br. filed Aug. 26, 2011, at 1.

Plaintiff's counsel conceded during oral argument that, because an offeror must be certified as a SDVOSB to be eligible for a VA procurement like that in the GSA Solicitation, plaintiff's failure to obtain such certification renders moot its contention that GSA improperly included a VA procurement in a contract bundle that did not comply with the procedures required for VA procurements (Count III of the GSA Complaint). According to plaintiff, its other claims were not mooted because plaintiff could self-certify its status as a SDVOSB.

As to the GSA Solicitation, defendant's position is correct. Plaintiff cannot demonstrate the requisite prejudice because it was ineligible to bid for the contract. It ultimately is plaintiff's own ineligibility, not GSA's alleged failure to encourage participation by SDVOSBs and SBCs, that would bar plaintiff from availing itself of the set-aside. Defendant also is correct that plaintiff would be unable to demonstrate the requisite prejudice because plaintiff, given its ineligibility for SDVOSB status, could not show that it had a substantial chance of securing the contract. See Labatt, 577 F.3d at 1378. Moreover, by plaintiff's own admission, it cannot self-certify itself as a SDVOSB for this Solicitation because the Solicitation contains a VA procurement, and such procurements can only be awarded to an entity that is listed in the VIP as a verified SDVOSB. 38 U.S.C. § 8127(e) (requiring small business concern and veteran owner to be listed in database in order to be eligible for award of VA procurement); 38 C.F.R. pt. 74 (establishing verification procedures for SDVOSBs). Because plaintiff did not qualify for inclusion in the VIP, it was not eligible for the GSA contract and cannot maintain suit for GSA's alleged failure to encourage participation by SDVOSBs. Accordingly, Count II of the GSA Complaint is mooted.

Regarding the DLA Solicitation, it should be noted that DLA dissolved all set-asides after determining that none of the offerors qualified as a SDVOSB or SBC; therefore, plaintiff's ineligibility to qualify as a SDVOSB does not preclude it from being awarded the contract as it does with respect to the GSA Solicitation. Nonetheless, it does render plaintiff's claims moot. Specifically, plaintiff has prayed that this court declare that the DLA (1) failed to make any attempts to encourage participation by SDVOSBs and SBCs (Count II of the DLA Complaint) and (2) impermissibly incorporated the NMR requirement into the Solicitation (Count III of the DLA Complaint). Plaintiff has also requested that this court enter an injunction dissolving the portions of the RFP designated as SBC and SDVOSB set-asides and requiring DLA to re-bid those portions without the NMR requirement. These claims are mooted in light of plaintiff's inability to qualify as a SDVOSB.

Plaintiff contends that it can salvage these claims by self-certifying itself as a SDVOSB. Self-certification, it argues, is acceptable because the DLA Solicitation does not

contain a VA procurement and thus does not require that an offeror be listed as a verified SDVOSB in any database. Although self-certification may be acceptable, it is not available in this case. To be considered a SDVOSB, a small business concern "must be at least 51 percent unconditionally and directly owned by one or more veterans or service-disabled veterans." 38 C.F.R. § 74.3. Moreover, the service-disabled owner must control the "day-to-day management and long-term decisionmaking" of the entity. 38 C.F.R. § 74.4(a). As explained in the CVE letter, the service-disabled veteran does not directly own plaintiff; rather, the service-disabled veteran owns BlueStar Energy Holdings, Inc., which indirectly owns plaintiff through one of its wholly-owned subsidiaries. This does not satisfy the requirement that the service-disabled veteran directly own the small business concern. See 38 C.F.R. § 74.3(a) ("An applicant or participant owned principally by another business entity . . . that is in turn owned by one or more veterans or service-disabled veterans does not meet th[e] [direct ownership] requirement."). The CVE letter also indicated that plaintiff does not satisfy the "control" requirement because plaintiff's Board of Directors could take decisive action in the absence of the service-disabled veteran. The CVE's finding is accurate and does prevent plaintiff from satisfying the control requirement. See 38 C.F.R. § 74.4(b) ("An applicant or participant's management and daily business operations must be conducted by one or more veterans or service-disabled veterans."). Because these decisions can be made without any involvement by the service-disabled veteran, plaintiff cannot be deemed to be controlled by the service-disabled veteran. Plaintiff, therefore, cannot in good faith certify that it qualifies as a SDVOSB. Consequently, Counts II and III of the DLA Complaint are dismissed as moot.

Plaintiff's inability to qualify as a SDVOSB also serves to deconstruct its futility argument. Essentially, plaintiff contends that it qualified as a prospective bidder for purposes of determining whether or not it is an interested party despite its failure to submit price proposals in response to the Solicitations. Plaintiff explained that it was futile to submit such proposals because GSA and DLA had made no attempts to encourage participation by SDVOSBs, resulting in a diminished likelihood that plaintiff would be awarded the contract. Given this showing and its intention to submit offers in response to any re-solicitations, plaintiff deems itself to be a prospective bidder. Plaintiff, however, is not a SDVOSB; therefore, the agencies' failure to encourage participation by such entities would not have rendered it futile for plaintiff to submit a bid. As such, plaintiff cannot establish its standing to bring these protests, and the remaining counts—Count I in both the GSA and DLA Complaints—are dismissed for lack of standing. 4/

---

4/ Plaintiff's lack of standing warrants dismissal of both of its complaints in their entirety. However, it is important to recognize that, even if plaintiff had standing to bring these protests, some of its claims are rendered moot and cannot be redressed by this court given plaintiff's inability to qualify as a SDVOSB. As such, only Count I (in both the GSA and DLA Complaints) is dismissed for lack of standing. Counts II and III in both complaints are dismissed on account of mootness.

## CONCLUSION

Accordingly, based on the foregoing, the Clerk of the Court shall dismiss the complaint pursuant to RCFC 12(b)(1) without prejudice for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

No costs.

/s/ Christine O.C. Miller
__________________________________
**Christine Odell Cook Miller**
Judge